Mary Jo O'Neill, AZ Bar No. 005924
Laurie Jaeckel, CO Bar No. 41447
Jillian Edmonds, NY Bar No. 5579024
EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
Denver Field Office
950 17th Street, Suite 300
Denver, CO 80202
Phone: (720) 779-3610
Fax: (303) 866-1085
Email: mary.oneill@eeoc.gov
       lauren.jaeckel@eeoc.gov
       jillian.edmonds@eeoc.gov

Attorneys for Plaintiff

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**

| | |
|---|---|
| U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>FRANCHISE MANAGEMENT, LLC,<br><br>Defendant. | **COMPLAINT AND JURY DEMAND**<br><br>Case No.: |

**NATURE OF THE ACTION**

This is an action under Title VII of the Civil Rights Act of 1964 ("Title VII") and Title I of the Civil Rights Act of 1991 ("Title I") to correct unlawful employment practices on the basis of sex and to provide appropriate relief to Charging Party Nathan Calaway, who was adversely affected by such practices. As alleged more fully below, Defendant Franchise Management, LLC ("Franchise Management" or "Defendant") engaged in unlawful discrimination by creating a hostile work environment based on sex. While employed by Franchise Management, Calaway

was subjected to ongoing sexual harassment by a supervisor. The harassment culminated in the supervisor sexually assaulting Calaway twice during a work shift in September 2020, which ultimately led to Calaway's constructive discharge.

## I. JURISDICTION AND VENUE

1. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 451, 1331, 1337, 1343, and 1345.

2. This action is authorized and instituted pursuant to Sections 706(f)(1) and (3) of Title VII, 42 U.S.C. § 2000e-5(f)(1) and (3), and Section 102 of Title I, 42 U.S.C. § 1981a.

3. The employment practices alleged to be unlawful were committed within the jurisdiction of the United States District Court for the District of Utah and venue properly lies in the District of Utah.

## II. PARTIES

4. Plaintiff, the United States Equal Employment Opportunity Commission ("EEOC" or "Commission"), is an agency of the United States of America charged with the administration, interpretation, and enforcement of Title VII and is expressly authorized to bring this action by Sections 706(f)(1) and (3) of Title VII, 42 U.S.C. § 2000e-5(f)(1) and (3).

5. Defendant is a Utah limited liability company formed on or around August 13, 2004.

6. At all relevant times, Defendant has continuously conducted business in the State of Utah.

7. At all relevant times, Defendant has continuously had at least 15 employees.

8. At all relevant times, Defendant was an employer engaged in an industry affecting commerce under Sections 701(b), (g) and (h) of Title VII, 42 U.S.C. §§ 2000e(b), (g) and (h).

2

### III.    ADMINISTRATIVE PROCEDURES

9.    More than 30 days prior to the institution of this lawsuit, Nathan Calaway filed a charge of discrimination number 35C-2021-00348 with the EEOC alleging violations of Title VII by Defendant.

10.    Calaway filed his charge of discrimination with the Utah Antidiscrimination and Labor Division ("UALD") on June 7, 2021.

11.    The UALD provided Defendant notice of the charge of discrimination filed by Calaway on September 27, 2021.

12.    The UALD transferred the charge of discrimination to the EEOC on October 6, 2021.

13.    The EEOC investigated Calaway's charge of discrimination

14.    On September 19, 2024, the EEOC sent Defendant a Letter of Determination regarding the charge of discrimination.

15.    In the Letter of Determination, the EEOC found reasonable cause to believe Defendant had violated Title VII.

16.    In the Letter of Determination, the EEOC invited Defendant to join with the EEOC in informal conciliation efforts to endeavor to eliminate the unlawful employment practices and provide appropriate relief.

17.    The Commission engaged in conciliation efforts with Defendant to provide it with the opportunity to remedy the discriminatory practices described in the Letter of Determination.

18.    The EEOC and Defendant were unable to reach an agreement through the conciliation process.

19. On December 18, 2024, the EEOC issued to Defendant a Notice of Failure of Conciliation advising Defendant that the Commission was unable to secure from Defendant a conciliation agreement acceptable to the Commission.

20. All conditions precedent to the institution of this lawsuit have been fulfilled.

## IV. GENERAL ALLEGATIONS

### Franchise Management and the Provo Subway

21. Franchise Management operates sandwich shops and owns over 20 Subway shops in Utah.

22. At all times relevant to this matter, Franchise Management owned the Subway shop located at 1220 N. 900 E., Provo, Utah 84604 ("the Provo Subway").

23. In 2020, Logan Kovacs was Franchise Management's Chief Operating Officer.

24. In 2020, Justin Nielson, who was 35 years old at the time, was Franchise Management's Operations and Marketing Director.

25. Kovacs was Nielson's direct supervisor.

26. As part of his duties as Operations and Marketing Director, Nielson visited the Provo Subway approximately twice per week

27. Nielson oversaw multiple Franchise Management Subway stores and the majority of his job was to help provide service assistance in the stores he supervised.

28. Nielson had authority to hire, discipline and, at minimum, recommend the termination of employees.

29. Aaron Rowlette was the Store Manager at the Provo Subway.

30. Nielson was Rowlette's direct supervisor.

4

### Calaway's Employment

31. Calaway started working for Franchise Management at the Provo Subway as a sandwich artist on or around June 5, 2020.

32. At that time and during his employment with Defendant, Calaway was 16 years old and a minor.

33. Rowlette was Calaway's direct supervisor, although Nielson also had supervisory authority over Calaway.

34. Before he was hired by Defendant, Calaway interviewed with Nielson.

35. During an interview in May 2020, Nielson questioned Calaway about the nail polish he was wearing at the time.

36. Calaway explained that the nail polish was for Pride Month and he was bisexual.

37. Nielson then informed Calaway that he was gay.

### Nielson's Sexual Harassment of Calaway

38. From June 2020 through September 2020, Nielson sexually harassed Calaway on a weekly basis.

39. For example, when Nielson and Calaway worked together, Nielson would regularly tell Calaway about Nielson's sexual experiences.

40. Nielson would also talk about pornography with Calaway, including showing Calaway pictures of men in underwear.

41. These discussions made Calaway very uncomfortable.

42. Nielson also recommended to Calaway that he borrow movies with nudity in them, including one movie about a kid that had a gay sexual relationship with an older man.

43. On several occasions, when grabbing and putting away knives used to cut bread at the Provo Subway, Nielson's hand would graze over Calaway's crotch.

44. Calaway did not experience this hand grazing with any other employee, so it seemed intentional on Nielson's part.

45. These occurrences made Calaway very uncomfortable.

46. On multiple occasions, Nielson asked Calaway what kind of underwear Calaway was wearing.

47. On a few occasions, Nielson also asked Calaway to send Nielson pictures of himself in his underwear, which Calaway never sent.

48. On multiple occasions, Nielson would show Calaway pictures of himself, Nielson, in his underwear, as well as pictures of other men in their underwear or naked.

49. Calaway did not like receiving these images from Nielson, as he thought it was weird for his manager's boss to send these images to him.

50. Rowlette observed that Nielson showed Calaway favoritism and would go out of his way to speak with Calaway.

51. Other employees noted that Nielson behaved differently with Calaway and that there was a "difference in the air" when Nielson worked with Calaway.

52. Calaway was physically smaller than Nielson and Calaway knew that Nielson was able to fire him.

53. Calaway observed that Nielson was "buff" and bigger and stronger than Calaway.

54. Calaway believed Nielson would be able to harm Calaway.

55. At the time, Calaway weighed roughly 100 pounds and did not feel physically able to defend himself.

56. This made Calaway scared to confront Nielson about his sexual harassment.

## The Sexual Assaults

57. On September 25, 2020, Calaway, Nielson, Rowlette, and another employee were working at the Provo Subway.

58. Nielson directed Rowlette to go help out at a different store and Rowlette left the Provo Subway.

59. Nielson also sent the other employee who had been working with Calaway home.

60. Nielson then made a "bet" with Calaway, in which they would race to see who could complete a customer's order first.

61. These races were customary at the Provo Subway and Calaway therefore expected that if he lost to Nielson, the result would be something mundane, such as doing dishes or prepping tuna, which were seen as less desirable tasks.

62. After Nielson won the "bet," Nielson led Calaway to a back room of the store, where it was dark.

63. Although there was a security camera the back room of the store, this camera was nonfunctional at the time.

64. Nielson then sexually assaulted Calaway.

65. At this point, a customer came into the Provo Subway, and Nielson and Calaway both left the room to help the customer.

66. After helping the customer, Nielson again led Calaway to the dark back room of the Provo Subway and Nielson sexually assaulted Calaway again.

67. After the sexual assaults, Nielson instructed Calaway that everything that happened should stay between them and told Calaway he could not tell anyone.

68. Calaway, a minor at the time, was left frozen and shaken after being assaulted by his boss almost twenty years his senior who was also bigger and stronger than Calaway.

69. Calaway did not and, as a minor, could not consent to the sexual contact by Nielson.

70. The sexual assaults had shaken Calaway up so much that he wrote the date of the assaults in marker under the counter in the store.

### Calaway's Constructive Discharge

71. Calaway was so upset and distraught by the sexual assaults that he did not show up to work his scheduled shift the following day.

72. Instead, he reported to Rowlette that he had COVID-19.

73. At the time, anyone working for Defendant who discovered they had COVID-19 was required to take off work for two weeks.

74. Calaway feared that he would see Nielson if he went back to work.

75. Calaway felt that Nielson knew sexually assaulting him was wrong and that Nielson would have done anything to stop Calaway from reporting the assaults, especially given that Nielson had told Calaway not to tell anyone.

76. Calaway was afraid Nielson might sexually assault him again.

77. Calaway was also afraid Nielson might physically hurt him.

78. In addition, Calaway was afraid of retribution or losing his job if he reported the sexual harassment and assaults to "higher ups" at Franchise Management.

79. Calaway's father noticed Calaway was depressed and was not going to work.

80. When Calaway's parents asked him why he was not going to work, Calaway told them about the sexual assaults.

81. On October 12, 2020, Calaway's mother called the Provo Police Department to report the sexual assaults.

82. After meeting with Calaway and his mother on October 12, 2020, the Provo Police Department obtained a search warrant and met with Rowlette on October 13, 2020 to investigate the incidents at the store.

83. Police confirmed that Calaway's writing under the counter documented September 25, 2020 as the date of the sexual assaults.

84. The police also later detained and questioned Nielson.

85. Because Calaway was a minor, any sexual contact between Nielson and Calaway was a criminal act.

86. The Provo Police Department considered charging Nielson with Forcible Sexual Abuse (a second-degree felony) and Forcible Sodomy (a first-degree felony), but ultimately recommended charges of Unlawful Sexual Conduct With 16- or 17-Year-Old and Unlawful Sexual Conduct With A Minor (Non-Intercourse).

87. The State of Utah charged Nielson with two counts of Forcible Sodomy (first-degree felonies) and one count of Forcible Sexual Abuse (second-degree felony).

88. The two Forcible Sodomy charges were dismissed with prejudice and Nielson was adjudged guilty of Forcible Sexual Abuse by pleading guilty.

89. Calaway never returned to work at the Provo Subway.

90. Calaway was traumatized by the sexual assaults and did not feel safe returning to the Provo Subway.

91. Calaway did not want to work in the store where he had been sexually assaulted, as he felt he would be forced to remember the assaults constantly.

92. In addition, Nielson knew the location of the Provo Subway and that Calaway worked there, which made Calaway feel unsafe.

93.     Calaway also was embarrassed because his coworkers knew that he was sexually assaulted after police searched the store.

### Defendant's Inadequate Prevention Efforts

94.     The store employees employed by Franchise Management largely consist of young workers with no previous work experience and little to no knowledge of their legal rights

95.     Although Franchise Management provided computerized onboarding training, the training primarily focused on other aspects of the business, including food safety.

96.     Per Franchise Management's Employee Handbook, employees "should notify [their] immediate Manager, the Area Manager or Human Resources Representative" if they "believe[] that [they have] been sexually harassed."

97.     No contact information was provided for these individuals in the Handbook.

98.     Defendant's employees, including Calaway, were not provided a copy of the Handbook either physically or electronically.

99.     Although the Provo Subway had a Subway Master Phone List, it was kept above the prep table and typically used to contact other stores when the Provo Subway ran out of an ingredient.

100.    Defendant's employees, including Calaway, were not informed the Subway Master Phone List was intended to facilitate a complaint process for harassment and discrimination.

101.    The Subway Master Phone List primarily consisted of phone numbers and addresses for other Subway stores.

102.    The Subway Master Phone List did not identify names of Managers, Area Managers, or Human Resources employees.

103. Although Calaway knew that Rowlette was his manager, he also knew Nielson was Rowlette's boss.

104. Complaining to Rowlette, whose boss was Nielson, was not a reasonable option under the circumstances.

105. Defendant did not maintain a hotline for store employees to report complaints of sexual harassment.

106. Furthermore, at the time Calaway was sexually assaulted by Nielson, Defendant did not have an established process for investigating complaints of discrimination.

107. Calaway was never interviewed as part of any investigation conducted by Franchise Management.

108. Although Nielson was ultimately terminated, no investigation was conducted as to whether sexual harassment was occurring at Defendant's other stores.

## V.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Harassment/Hostile Work Environment – 42 U.S.C. § 2000e-2(a)**

109. All allegations above are hereby fully incorporated by reference.

110. Beginning no later than June 2020 and continuing through October 2020, Defendant discriminated against Calaway in violation of Section 703(a)(1) of Title VII, 42 U.S.C. § 2000e-2(a)(1), by harassing him and creating a hostile work environment because of his sex, male.

111. The offensive conduct described in the preceding paragraphs was unwelcome and sufficiently severe or pervasive to alter the terms and conditions of employment for Calaway.

112. Defendant knew of, or in the exercise of reasonable care should have known of, the hostile work environment suffered by Calaway because of his sex.

113. Defendant failed to take prompt or effective action to prevent, correct, or remedy discriminatory and sexually harassing behavior in the workplace.

114. The effect of the practices complained of above has been to deprive Calaway of equal employment opportunities and otherwise adversely affected his status as an employee because of his sex.

115. The unlawful employment practices complained of above were intentional.

116. The unlawful employment practices complained of above were done with malice or with reckless indifference to the federally protected rights of Calaway.

## SECOND CLAIM FOR RELIEF
### Constructive Discharge – 42 U.S.C. § 2000e-2(a)

117. The allegations contained in the foregoing paragraphs are hereby incorporated by reference.

118. Calaway was constructively discharged in violation of Section 703(a) of Title VII, 42 U.S.C. § 2000e-2(a)(1).

119. Defendant's discriminatory acts made working conditions so intolerable Calaway reasonably felt compelled to resign.

120. The effect of the practices complained of in the foregoing paragraphs has been to deprive Calaway of equal employment opportunities and otherwise adversely affected his status as an employee because of his sex.

121. The unlawful employment practices complained of above were intentional.

122. The unlawful employment practices complained above were done with malice or reckless indifference to Calaway's federally protected rights.

## PRAYER FOR RELIEF

Wherefore, the EEOC respectfully requests that this Court:

A. Grant a permanent injunction enjoining Defendant, its officers, agents, servants, employees, successors, attorneys, and all persons in active concert or participation with it, from engaging in any employment practice that discriminates on the basis of sex.

B. Order Defendant to institute and carry out policies, practices, and programs that provide equal employment opportunities for all persons, regardless of sex, in order to eradicate the effects of past and present unlawful employment practices by Defendant, including but not limited to training for all owners, managers, and employees.

C. Order Defendant to make whole Calaway by providing all appropriate damages authorized by law, including backpay, front pay, pre- and post-judgment interest, in amounts to be determined at trial, and other affirmative relief necessary to eradicate the effects of its unlawful employment practices, including but not limited to lost wages, benefits, and compensation for all monetary losses of Calaway.

D. Order Defendant to make whole Calaway by providing compensation for past and future nonpecuniary losses resulting from the unlawful employment practices described in the paragraphs above, including emotional pain, suffering, inconvenience, loss of enjoyment of life, and humiliation, in amounts to be determined at trial.

E. Order Defendants to pay Calaway punitive damages for its malicious and reckless conduct, as described above, in amounts to be determined at trial.

F. Grant all equitable relief needed, including but not limited to reinstatement, to effect justice and make whole Charging Party Nathan Calaway.

G. Grant such further relief as the Court deems necessary and proper in the public interest.

H. Award the EEOC its costs of this action.

RESPECTFULLY SUBMITTED this 16th day of May 2025.

                Andrew Rogers
                Acting General Counsel

                Christopher Lage
                Deputy General Counsel

                Mary Jo O'Neill
                Regional Attorney
                Phoenix District Office

                Laurie Jaeckel
                Assistant Regional Attorney
                Denver Field Office

                *s/ Jillian Edmonds*
                Jillian O. Edmonds
                Trial Attorney

                EQUAL EMPLOYMENT OPPORTUNITY
                COMMISSION
                Denver Field Office
                950 17th Street, Suite 300
                Denver, CO 80202
                Phone: (720) 329-0821
                jillian.edmonds@eeoc.gov

**PLEASE NOTE**: For purposes of service upon the EEOC, it is sufficient that pleadings, notices, and court documents be served upon the Trial Attorneys. Duplicate service is not required on the Acting General Counsel and Deputy General Counsel in Washington, D.C.